This is number 4-14-0457, David K. Eldridge v. Proemp, Inc., for the appellant. This is attorney Frank Byers for the appellee, attorney James Green for Proemp, and attorney Tucker, Deborah Tucker, for TARO. And you're splitting your time apparently. Okay. All right, Mr. Byers. Thank you. We are here today to determine if the facts laid in the stated claim under the theories in advance. There are two separate defendants in this case. Each defendant has a separate theory under which we are proceeding. With regard to Proemp, I'll address them first since they are the first part of my brief and the first part of the counts 1 and 2 that were ultimately dismissed by the trial court. As to Proemp, it's a pretty straightforward claim by us. Dow Development is being sued and we have asked for Proemp to indemnify us based upon the contractual language for the lawsuit that we are defending, that Dow Development is defending. And the contract, Dow Development, I'm sure the court has read all the facts and everything that's set out in here, so I'm going to give kind of an overall view at the moment. Dow Development was a company that was involved in real estate development and managing real estate in the Decatur-Macon County area. And they needed an employee to handle the books and papers and those kinds of things for the principle of Dow Development. Mr. Tim Dow contracted with Proemp to supply that employee to do that. And the contract, under the contract, the Dow, the Proemp employee came, worked in the facility of Dow Development for job functions where in addition to keeping the telephones and answering all the calls and opening the mail and doing all those kinds of things as the secretarial position would be, was that she also would write out the checks that were to be signed by Mr. Dow. And then she would, after he signed, mail those checks off to the people who deserved to get these funds. And then as part of that also, she would keep the ledger of how the funds were to be recorded in the records of Dow Development. And Dow Development was the manager of several different other entities, one of which was the Hickory Point Plaza, one of which was Executive Development. And so her job functions for Dow Development included managing the checkbooks and opening the mail and doing the things for those companies that were under that, that were under the management of Dow Development. So one of the things that she would do would be in the the handling, such as the bank statements and the check registers and everything, to the accountant, Mr. Tarrow, so that he could prepare what reports needed to be prepared, the tax reports that would come up on a regular basis. So one of the things that would happen is that this volume of documents that was coming to Mr. Tarrow, they, Mr. Tarrow at Sleeper Disbro, decided that it would be a better idea to have these things come in an electronic form under a QuickBooks type program. So he talked to Mr. Dow about that, and Mr. Dow said okay. And they, then Tarrow came out, well actually not Tarrow, but one of his employees came out to Dow Development and helped train Jennifer Campbell how to use this new computer program to report all of the stuff that was happening in the companies, the checks, the deposits, those type of things into the QuickBooks register. And as a result of Mr. Tarrow and his employee, or his agent, instructed Jennifer Campbell not to deliver any more of these copies of the checks and copies of the bank statements. All we needed was the computer printout in order to prepare the tax returns. So she did that, and that was the course of conduct until we discovered that our funds were being deferred. Jennifer Campbell would report all of it to Mr. Tarrow, who would then prepare the tax reports that had to be filed. So Jennifer Campbell apparently decided that this gave her an opportunity to divert funds to her own use, and so she then began diverting funds. Actually, she began diverting funds in the year 1997. And she ultimately, over the course of the time from 1997 to 2006, she diverted over $1.2 billion in funds. What year did they implement the computer program? The computer program was implemented, and I believe it's pled in the complaint, Your Honor. The computer program was implemented. I don't want to misstate it. I don't recall off the top of my head, and I believe it's in the complaint, but it would have been about the time of the year 98 or 99, I believe, if I remember correctly, but I think it's pled the actual time. So she had already begun to divert funds at the time the computer program was instituted? No, I don't believe that. I believe she diverted funds after the computer program was instituted. Okay, I thought you said she started to divert funds in 97. She did, and I spoke on the time that the computer program came in, because she diverted funds after the computer program came in, not before the computer program came in. She started diverting funds in 97, so it would have been 96 or early 97 that the computer program came in. She diverted funds after the program rather than before the program. I believe that's what the facts will be, or are, as a matter of fact. And so she then started diverting the funds, and Mr. Eldridge, David K. Eldridge, when he got his 2,000 tax returns prepared, and as a practical matter, these returns are never exactly on April 15, because the volume of businesses that they have, there's some delay that there's always an extension, but there's some delay. He had a 2,000 tax return. He realized that he had received credit for more income than he had actually received personally, and that he was going to have to pay tax on a lot more income than what he had received. He said, why am I getting more income and paying tax on more than I actually received? Mr. Carroll said that he would investigate that and get back to him. But getting back to the ProAmp part of the claim, there was a contract between ProAmp and Dow Development, part of which said that we will hold you harmless for any wrongful acts of a ProAmp employee. We will hold you harmless for any wrongful acts, not just negative, but wrongful acts. Of course, there was another part of the contract, in the initial contract that's planted there, that said that Dow Development will be responsible for the on-site type supervision of the person that comes. However, there's an extension to that contract, and that addendum then said that ProAmp will be responsible for on-site supervision, and that is the way we find ourselves at the time of the institution of the computer program that came in, that ProAmp was supposed to be responsible for the on-site supervision. That addendum stated it was for purposes of state unemployment matters. Does that limit the scope of the addendum? Your Honor, that's what Judge Little found. I don't believe that that is the way I would read the case, and I don't believe that's what are the language, and I don't believe that that... I don't know how you can limit how you get on-site supervision for state unemployment and not get on-site supervision authority for everything. Well, but we're supposed to, like the reading statutes, put some weight to every phrase within contractual provision, and the argument you make would essentially delete the introductory clause, would it not? No, I don't believe so, Your Honor. Well, if, as a for instance, for all purposes, ProAmp is responsible for on-site supervision, which is essentially the argument, what purpose is there by including as the very first clause of that addendum for the purposes of state unemployment common? Your Honor, I'm glad you back in those days, because that provision is no longer valid, but back in those days there was a great dispute, and you probably had cases that would come up on who was responsible for the employee, and the state unemployment claims were being asserted against employers and against the leasing company as to who was responsible for a particular employee, and it was coming up in the taxes. But if you go back and look at the language of the regulations at the time, they were trying to help define who has responsibility between those two types of things, but that responsibility went for more than just state unemployment. If you go back and look at that area of the law back in those days, that responsibility also applied to things such as liability. Those cases are not limited to just the unemployment issue. But that doesn't really answer my question, counsel, as to how do we give weight to the first clause if it's not supposed to be limiting in some sense? That is, if it applies, if PRO-EMP is supposed to be responsible for on-site supervision under all circumstances, why is that first clause present? What does it mean? Well, I think if you look back at the controversy that was going on at the time, I think the PRO-EMP wanted to clarify that they are the ones who are responsible. That controversy spilled over to not just the state unemployment tax, but the cases arising out of that were also used in other contexts. Well, I think the clause would then have said that PRO-EMP will act as sole authority on all functions, blah, blah, blah, and on-site supervision, comma, including the purposes of the State Employment Act, if it was designed to be as broad as you mentioned, and also then to specifically clarify, and by the way, we mean the state unemployment concerns as well. That would be a great way to have written that. Yeah, it would have been if that's what, in fact, they meant, but by providing this as the introductory clause, and your argument that it goes beyond state unemployment concerns, you seem to be, in effect, diminishing any significance of the introductory clause at all. Well, I don't believe I, maybe I am, but I don't believe I intend to. If you look at that state unemployment law, the body of unemployment law also included things beyond just the tax. It also included responsibility and liability for the person. Those cases were used for more than one thing. I don't, I think it's beyond what the, as it applies only to the issue of tax. I think under that whole body of unemployment case law that was going on at the time, it also does, those cases also applied into the liability field too. So I don't know how better to answer your question. It's not a simple answer, and it's not a simple question. So I think what that meant in summary is that it encompassed that whole body of case law, not just the responsibility for the tax itself. But that's my belief on the way it should be read. Getting back to the scenario of what occurred, Jennifer Campbell, after she began diverting the funds and reporting the information to Terrell, that he would prepare the tax returns. And each year after 2000, either, excuse me, both Mr. Dowd and Mr. Eldridge would contact Mr. Terrell and say, how can it be that we're paying tax on so much money when we're not getting that much cash to us? And each year, Mr. Terrell would say, I'm going to investigate why this is occurring. And then he would, after a few weeks, he would get back to us and he would tell them, look, you're just paying down your debt early. That's what's happening, you're just paying down your debt early. Is there anywhere in the record that shows what was the basis for his answer? There is nothing in this record that shows that. In fact, I believe the evidence would be, if we ever get to the trial, is that the debt was not being paid down early. Was Jennifer Campbell submitting in the computerized record some evidence that that's where the check was going? No, the computerized records do not reflect any additional payments. Well, no real ones, but were they masqueraded in her entries? No, there's no additional payments that are reflected in the entries that go to the lending institution. What she was doing was she was skipping check numbers, or she was putting check numbers on the deposits to use up the check numbers that she was writing to herself, or to her bank, or to whoever. So, for instance, if she had written check number 1522 to herself, she might have used that check number on a deposit. And so it would say, check number 1522, deposited to the bank, and then instead of having an amount coming out on the outside, she would put it on the inside. So if you're just reading down the numbers, you would think, okay, there's check 1532. But if you looked on the other side, you would see that it was a deposit, not a check. And that's one of the things that we thought Mr. Carroll should have been able to see. A simple, instead of telling us we're paying our debt down early, a simple phone call to check on these checks, to see where it was going, to see what happened. He could have investigated. He could have done a lot of things to investigate. And there is some, there's the position that is advanced by Mr. Carroll that we should have done the investigation ourselves. Well, we did. We asked him. We have multiple businesses, as alleged in our complaint, that Mr. Carroll was the accountant for. We have multiple interests in multiple different businesses. And so when we see something that we see that looked unusual, we're paying more tax on income we didn't get or didn't have the use of, we call our accountant and say, okay, tell us why that is. Investigate it. I see my time is close enough. I want to make sure I answered your question. But that's, that's, well, we were investigating. That's exactly what we were doing when we called Mr. Carroll and said, hey. So did he make up that answer on a whole clock? I have no idea. We have not yet taken his deposition. So I have no idea what he's going to say on that. But he said that answer on multiple different occasions. And it was just plain flat wrong. It was not a true statement. We were not paying our debt down early. We were paying the monthly payments exactly as ordered, or excuse me, as agreed under the mortgage. But we were not making any extra payments. So there got to be a huge discrepancy in that. And this is a, these are large entities. So when we're talking about this, you know, if I had a million dollars missing out of my account, I would know it. There's no question about it. But we're talking about large entities that had a lot of money flowing through. And so it's not as on the face of it as it would be to me in my own little personal account. So we called and asked our accountant. And he said he would investigate. He gave us an answer. He's been our accountant for years. He did all of these. He's doing all of these companies for us. He told us why. Okay. We believed it. Was he hired to audit? I'm sorry? Was he hired to audit? No, he was not. He was not hired to audit. There's no question about that. He was not hired to audit. Like in many small communities such as Decatur, we, you know, there's very few local companies that hire an audit to get a full complete audit. He's not hired to audit. He's the one that we take all of our information to. He's the one who gives us returns on all of our different companies, provides us with all of the tax reports that need to be filed, gives us all of the information. I see my time is up. I hope I've answered. Right. We'll have more time on rebuttal too. See, Mr. Green, are you going first? Yes, ma'am. Okay. You may proceed. Okay. Please support it. Thank you. I represent Pro-Am. And my part of the case only deals with now development's claims against Pro-Am. And the parties that apparently had some money stolen from them, they've all dropped their claims against my client. And so we're down to the second bit of complaint. Dow Development was given three opportunities to plead. And the court properly held that Dow Development failed to stand a claim against my client either for breach of the contract or for negligence. This case reminds me of the first year of law school. When you take contract law, you learn that a contract is a promise or a set of promises for breach of which the law should provide a remedy. In this case, there's no cause of action because my client didn't fail to do anything it promised to do. And moreover, the complaining party doesn't have damages because of anything my client supposedly did wrong. Pro-Am is an employee leasing company. And of course, Dow Development is a property manager. Jennifer Campbell, it's alleged, was working under this employee leasing agreement and stole money from Dow Development clients. Not from Dow Development. And so the case is all based on the contract or the agreement that's attached to the complaint. And under that agreement, there are different responsibilities that are set out, different duties for each of the parties. And the original agreement called for on-site supervision of Jennifer Campbell to be handled by Dow Development and not my client. And not only did the original agreement talk about on-site supervision, but it was very specific. And I'm going to quote the most important language, which states, if employees are required in the course of their duties to deal with cash or any high-value item, Dow Development will institute procedures to safeguard such items. It shall be the sole responsibility of Dow and not Pro-Am to protect such valuables. So, if Dow Development's clients got ripped off because of Jennifer Campbell, that's a problem for Dow Development and not Pro-Am. Now, there was an addendum to the agreement that was signed. It was just a very short addendum. And it begins saying that for purposes of state unemployment, that my client, Pro-Am, might have responsibility for on-site supervision. But that language can't be expanded to make it all encompassing so that Pro-Am has to take sole responsibility for Jennifer Campbell for everything she does, particularly in connection with cash. So, there's no breach of contract based on the terms of the agreement attached to the complaint or even reconsidered the addendum. My client didn't fail to do anything I promised to do. We didn't promise to protect Dow Development clients from Jennifer Campbell. Well, what does the on-site supervision language that Mr. Byard cited in that addendum mean in the context of unemployment insurance? And more specifically, why does it even need to be there? What was it addressing? Well, I don't know. I can't really tell you what it means other than what it says. And so, I think the only reasonable inference is that Pro-Am is going to handle the state unemployment taxes. And that's part of our responsibilities. Well, if the on-site supervision language, that last clause, were present, you'd still have to handle the unemployment compensation business, would you not? That's probably true based on the terms of the original agreement. What is the on-site supervision that you're promising to do? What does it do in that? It's only for purposes of state unemployment according to the plain language. But, of course, our point is that it cannot be inferred from that that we're responsible for protecting Jennifer or preventing Jennifer Campbell from stealing money. But, what's even more interesting is that, even for the sake of argument, we somehow reached the kind of conclusion we didn't, but even if we didn't, the plaintiffs thought to show that there were damages. And at this point, it's pure speculation to say that Don Goldman has damages. Their clients certainly have damages if the allegations are true. And at this point, Don Goldman is independent of the lawsuit, but there's no allegation that there's a judgment against Don Goldman, or that we've got to settle what we've had to face. So there's no damages in addition to us not reaching any promise. And then if we go to the count too, that's a negligence count. And quite simply, our defense is the Mormon Doctrine, and it's well established, of course, that a plaintiff cannot recover sole economic losses under the core theory of negligence. There are exceptions to the Mormon. None of those exceptions are flat here. And so really what this comes down to is that job development has a remedy against my client pro-empt of the breach of contract. But there is no breach of contract based on what I already explained. So the circuit court got it right under 2615. There's no cause of action against pro-empt of either the breach of contract or the negligence. And the circuit court should be affirmed. Thank you. Thank you, Mr. Green. Ms. Tucker? Morning. Morning. I'm Dr. Tucker. I represent two police, Mr. Rick Till and Mr. Hanson. And this is one of my secretaries that I'm coming from. I'm curious as to the question Justice Bolt raised to Mr. Byers, and that is, where did this response come from, your client, that this stuff was just being, what did he say, paid off in advance or something like that? What is this record before a show and what should we, how should we review it? Well, Your Honor, this is a 2615 motion. And so, of course, the plaintiffs have to accept the allegations at this stage that the plaintiff is true. So for the purposes of this motion, we have to assume that there was no debt being paid down because the plaintiffs have explicitly alleged that. However, the plaintiff's complaint and the attachments, if you look at the payees on the checks, there are multiple checks written to Target National Bank for considerable debt. And if you look, there are several generally around this office to Target National Bank. Well, I suppose to be more specific, this case would be, seems to me to be different if in response to inquiries from the plaintiff, he said, gee, I don't know. Essentially, you find out. I don't know what's going on. But he apparently, according to the allegations, which as you correctly put, we have to accept as truthful this point because it's a 2615, a response that was quoted suggests some inquiry or some familiarity in something. And again, I'm not sure quite how to, what to make of it. Yes, of course. But it also, we also must remember that to every cause of action, there's more than one element. So they have pleaded that we have a false response. We have to accept that as true. But that does not mean that the plaintiffs have succeeded in cleaning the elements of proximate cause and duty. So those are the two elements that are missing from the allegations of the plaintiff's complaint. So by duty, you mean he didn't, he wasn't required to do anything on behalf of the plaintiffs in response to this inquiry? Well, what I'm suggesting is that I believe that the case law is quite clear that a duty to protect somebody from criminal conduct of a third party does not arise from any source. In the brief, I've gone through the possible sources of such a duty, whether it was an agreement, a contract, and I've demonstrated that there was no such obligation. In other words, the plaintiff did not come to the defendants and say, will you do a broad examination, which is a particular discipline in accounting where they perform certain procedures to see if a fact has occurred. As just I hope already have the plaintiffs admit, they also didn't even contract for the accounting firm to do an audit. And even if they had, the professional standards are crystal clear that even a properly performed audit is not designed and likely does not detect theft. So the point being is that all we have here is a thin reed to couch liability on. We have a simple question and an answer. Now, plaintiffs have pledged, yes, that that answer was incorrect. But they haven't established the approximate cause and a duty to perform the services required, the extensive services that would be required, to detect theft. Because when you have theft going on in an organization, you have false records. So you have a check, for example, as the plaintiff shows, to target national bank for an account, you have to go behind that check and say, well, is that a valid debt of the entity? That is a scope of services that is far beyond anything that was contracted for. So there was a question and an answer, allegedly false, but that does not satisfy the requirements of approximate cause and duty to do the extensive procedures that are necessary when we're talking about detecting forgery and other forms of conduct. Those procedures are very extensive, and they simply were not contracted for. So it's the approximate cause and the duty elements that fail here. Now, with respect to the claims, the plaintiffs here are really asking this court to expand liability of an account far beyond that which is currently recognized by the law. It also must be remembered that the plaintiff has asserted two specific types of claims here in the 30-minute complaint. There's negligent misrepresentation claims, and there are breach of contract claims. So if you look at the elements of those specific claims, it's noteworthy that there is no negligent claim. So, for example, when we talk about a computer program being implemented, there was no representation made that that computer program was theft-proof. So that's really kind of beside the point. The only representation that the plaintiffs have alleged is this representation about what the cash was being used for. A thief is the classic intervening cause that we all heard about in the beginning of the law. It's a classic situation where you have a third-party element that constitutes an intervening cause that breaks the chain of causation between an alleged violation such as providing false information and a lost business case. When a thief intervenes in that chain, that's an intervening cause, and that cuts off the liability of a defendant. Now, the plaintiff's own allegations themselves reveal that the plaintiff's failure to investigate the theft was completely independent of the alleged misrepresentation. We know that because of the timing. So the theft began allegedly in July 1997 and continued until April 2006. Let me go back. I apologize for interrupting you, but I want to give a clarification on this, and this is something that I personally have not much familiarity with. But going back to your client and what he said, and I understand your argument that there's no duty, but does his response that he didn't need to make, but did his response create an expectation, a reliance on the part of the plaintiff that would not otherwise have existed? For instance, if you're saying he didn't have to do this and check for theft and it's a specialized thing, assuming that's all true, then why wouldn't Mr. Terrell's response have more appropriately been, this isn't within the scope of my services for you, I don't know where this deficiency comes from or why it's present, this might call for a forensic audit or whatever the term is, as opposed to informing them that the reason that they did not have the cash flow they expected was because the cash flow was being used to pay off the debt owed by them early, which might lead them to refrain from taking the steps otherwise they would have to have caught this. In other words, it's kind of, I'm not sure if I'm using the term correctly, but in a negligence context, someone may not owe a duty, but if they volunteer to step forward and take actions which they weren't required to do, then there might be a cause of action based upon their having done so. Why doesn't that apply to you? Well, because we know by the plaintiff's own allegations that reliance did not occur, and we know that by the timing of the events as alleged by the plaintiff. So the theft started in July of 1997 and continued until April of 2006. The misrepresentation started in the year 2000, so there were over two years from July 1997 throughout 1999 where the theft was occurring, the plaintiffs were not investigating or the plaintiffs themselves would have discovered it, but yet there were no misrepresentations being made by Tyrrell. What about after that point? Well, after that point, if you look after that point, it's telling as well, because the plaintiffs say that the defendant's misrepresentation continued throughout, but yet the plaintiffs themselves discovered the theft on April 18, 2006. So apparently, even though Mr. Tyrrell was allegedly making misrepresentations, the plaintiffs did decide to investigate and then they discovered it. Six years later. Of course, yes. But more importantly, I think that the case of Fox Associates, which is cited on page 24 of our brief, is really conclusive with respect to your inquiry, because in that case you have precisely the situation where an inquiry specific to criminal activity was made, where it happened to be an employment agency that was representing an employer, an employee, and the employer specifically asked the employment agency, does this bookkeeper have a criminal past? The employment agency responded, no. That was false information. In fact, the employee had been convicted of embezzlement from a previous employer. Is that the Fox Associates case? It is, yes. Go ahead. And so we have the precise fact pattern here, actually more egregious, because the specific question was, does this person have a criminal past? Here we have an inquiry that there was no indication by the plaintiffs that there was any need to look for any criminal activity. It wasn't like, hey, I think I have dishonest employees or I think I'm being stolen from. Can you please look into that? So the inquiry was completely generic. It was not focused on criminal activity at all. And so the Fox Associates case is a more egregious fact pattern. Well, the good news is, though, from the plaintiff's point of view, that that's a first district case that we don't have to follow. It's a question of, is it well-reasoned and persuasive? And it's somewhat similar in the sense that the respondent could have said, I don't know whether she has a criminal conviction or not. But by saying she doesn't, why wasn't there some justifiable reliance, so to speak, by the plaintiff in that case? And why was it appropriate to throw out that lawsuit? Well, understood. But the plaintiffs have also not cited any cases from this district that shows that this is a mistake of the law. This case, factually, is quite on point. So if this district chooses to create a discrepancy in the law, then it feels differently. Then it will. And then I guess we'll all be back here. Hopefully, Your Honor is not so doubtful of lawyers from the Chicago area as justices from the Chicago area. But in any event, I think Your Honor is absolutely correct in that it seems theoretically troubling that you have a false answer. And so it seems like, oh, there should be liability. But if you really are rigorous in looking at the elements and the state of the law with respect to consummate cost and respect to duty, if you look at those rigorously, I think you'll find that providing false information does not open the door to any and all liability, no matter what the nature of the loss is and no matter what the agreed-upon services were. That would be very, very expensive. If you can imagine the consequences of that, that any time somebody asked a question and got a false answer, now anybody, a professional or not, would be responsible for any and all sorts of losses that happen that have some sort of tangential connection to that information. And that's simply not the law. That would be incredibly expensive and ruining. And that's why you see in the cases that we've cited a very rigorous analysis to the concepts of constant cost and duty to bring in that sort of expensive liability. I don't want to interrupt you, but you're out of time, Ms. Tucker. So thank you. Mr. Byers, any rebuttal? Mr. Byers, what precisely was the contract between your clients and the accountant? Your Honor, there was a, let me give you the whole thing, not just the part that we're talking about. My clients had used Mr. Patero extensively on multiple businesses over multiple years. He prepared tax returns for them. He prepared both, all kinds of information returns and year-end returns. He communicated with the, when there was issues between my clients and the taxing bodies, he was the person who answered the questions for the Internal Revenue Service or the Illinois Department of Revenue. As you can imagine, because of the multiple businesses, there's always multiple issues that come up over time. And so he was the person who responded to those types of inquiries for my clients on multiple of their businesses, not just one thing. So that's kind of the background of where he was at the moment in time. When we asked him, we're not getting as much, we don't have the funds that we're getting reported on our tax return. Can you tell us why that is? Can you look into that and tell us why? And then he said he would. And then a few weeks later, he gets back and says, you're paying off your debt early. I can't give you a more definitive answer than that, because that's both the historical context that comes up in and that's the question that was asked and that's the answer that was given. I do want to mention just a couple things to rebuttal. First, with regard to Pro-Am, there was not cash stolen. The pleadings, Mr. Green referenced the section of the contract that says that we will be responsible for instituting procedures that protect our cash. Well, there was not cash stolen. It was checks. It was checks that were written to herself. I don't know if the language of the contract meant holding money, U.S. dollar bills, but that there was no U.S. dollar bills holding money. It was checks out of the checking accounts. Doesn't the contract refer to something beyond cash, too, so use some other terminology? It does, Your Honor, but I want to make that clear. Isn't the other terminology broad enough to include, for lack of a better way to put it, cash flow, which is really what's at issue here if you're writing bogus checks? Well, there's also another provision in that same contract, in that original version, before we ever get to the amendment, that says that Pro-Am will hold down development harmless for any wrongful acts of its employee. Those two have to be read together as an overall. Did it say any wrongful acts of its employees or its own wrongful acts? Well, it says, well, the corporation can only act through its employees, so it says that it's wrongful acts, I believe, and I quoted the language in the brief. I don't believe the language was that it would be responsible for the wrongful acts of its employees. I will, if I've misstated it, I apologize before I, I believe it's stated in the brief, the actual language that it states. It says, Pro-Am agrees to release, defend, and indemnify and hold the client harmless for any and all wrongful act, wrongful or negligent acts of Pro-Am Inc. or any failure of Pro-Am Inc. to act in performance of its duties under the current system. That's the exact language. Right, and that's different than saying they're responsible for any wrongful acts of their employees. Pro-Am Inc. is an entity in and of itself. That is true, but it operates through its employees, and I don't know how the company can do a wrongful act if its employee doesn't do a wrongful act. That's for its officers and its board of directors. Well, certainly, but they are also employees. The board of directors and officers, I would suggest to the court, are also employees. I don't know if you should draw a line at what level of employee we're talking about, whether it's the president or the vice president or the lady that comes to the Dow developments. At some point in time, they are Pro-Am. They are the company. They are, that's how the company operates. So, I don't know if that answers your question, but that's one thing I wanted to point out, is the fact that that provision is also and competes with that, and has to be read in context with the provision that Mr. Green cited to the court,  The, I want to address the, oh, I'm sorry, I have no time left. All right, thank you, counsel. We'll take this matter under advisement and be in recess.